IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2018

**RODERICK DEWAYNE CROSBY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1911    Mark J. Fishburn, Judge**

_____

**No. M2017-01482-CCA-R3-PC**

_____

A Davidson County jury convicted the Petitioner, Roderick Dewayne Crosby, of four counts of aggravated kidnapping, three counts of aggravated robbery, one count of burglary, one count of aggravated assault, and one count of possession of a firearm during the commission of a dangerous felony, and the Petitioner received an effective sentence of thirty-four years. On appeal, this court affirmed the judgments. *See State v. Roderick Dewayne Crosby*, No. M2014-00914-CCA-R3-CD, 2015 WL 4197613, at *1 (Tenn. Crim. App., at Nashville, July 13, 2015), *perm. app. denied* (Tenn. Oct. 15, 2015). The Petitioner filed a post-conviction petition, and the post-conviction court denied relief following a hearing. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Jesse Lords, Nashville, Tennessee, for the appellant, Roderick Dewayne Crosby.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Davidson County jury convicted the Petitioner of four counts of aggravated kidnapping, three counts of aggravated robbery, one count of burglary, one count of aggravated assault, and one count of possession of a firearm during the commission of a

dangerous felony. On direct appeal, this court summarized the evidence presented at trial as follows:

This case arose after the [Petitioner] and two others invaded the victims' home. T.B. testified that at the time of the incident, she was living with her grandmother, B.M., her mother, P.M., and her younger brother, J.C. B.M. slept on a couch in the living room, J.C. had his own bedroom, and T.B. and P.M. shared a bedroom ("T.B.'s room"). On the evening of the incident, after the rest of the family had gone to sleep, T.B. was awake in her bedroom when she heard several loud kicking noises at the door. She started screaming at her mother that someone was kicking the door, and the two rushed into the living room.

T.B. and P.M. saw three men in the living room. All three men were wearing dark "hoodies," had bandanas covering their faces, and were holding guns, which the victims testified were visible for the entirety of the incident. T.B. testified that the victims' cell phones were all on a dresser and that the men took the cell phones as soon as they entered the residence. The first man was later identified as Kirk Pointer, the second man was identified as the [Petitioner], and the third man was identified as "Pop." T.B. described the [Petitioner] as an African-American male who was "kind of short" with "shoulder length" dreadlocks. She believed that the [Petitioner]'s hood was down because she was able to see his dreadlocks. She testified that the [Petitioner] had his sleeves rolled up, and she saw that he had a sizeable tattoo of the letter "C" on his left arm. He wore a bandana tied around his mouth and nose, but the bandana slid off of his nose several times, allowing T.B. to partially see his nose. T.B. recognized him as a person whom she had previously seen at a store in North Nashville, but she did not know him by name. P.M. described the [Petitioner] as an African-American male who had dreadlocks that fell just beyond his shoulders. She also testified that his sleeves were rolled up and that he had a "very visible" tattoo of the letter "C" on his left arm. P.M. saw that the [Petitioner] had other tattoos, but she did not attempt to identify them because the "C" was the most distinguishable tattoo. T.B. and P.M. both identified a photograph of a tattoo of a "C" as the tattoo that they saw on the [Petitioner].

T.B. believed that the men were intending to rob her sister's boyfriend, whom they mistakenly believed lived at the residence. She testified that the [Petitioner], after seeing a picture of her sister's boyfriend, informed Mr. Pointer and Pop that they were "in the right house," although

- 2 -

J.C. testified that it may have been Pop who identified the boyfriend. The men asked if anyone else was in the house, and P.M. informed them that J.C. was there.

J.C. testified that he was in his bedroom asleep when he heard shouting in the living room. He went to investigate the commotion and saw T.B., P.M., and B.M. in the living room with three armed men. J.C. attempted to return to his bedroom, and the [Petitioner] followed him into the room. J.C. described the [Petitioner] as an African-American male who was 5'8" or 5'9" tall with dreadlocks "past his shoulders." At one point, the [Petitioner] grabbed J.C.'s arm and ordered him to go into T.B.'s bedroom. J.C. was able to look at the [Petitioner's] arm, and he saw a large, green letter "C" tattooed on the [Petitioner's] left arm. He saw that the [Petitioner] had other tattoos, but he could not identify them. He testified that the [Petitioner] wore a blue bandana tied around his face that fell down several times, allowing J.C. to see the [Petitioner's] face from the top of his lip to his eyes at times during the incident. J.C. testified that he was attempting to pay close attention to the [Petitioner's] face "[t]o see if I could see who he was or could I remember who he was."

The men took all of the victims into T.B.'s bedroom and ordered T.B., P.M., and J.C. to lie on their stomachs on the bed and to place their hands behind their backs. Mr. Pointer then put duct tape on their hands, ankles, and mouths. B.M. was in the bedroom, but the men did not duct tape her. As Mr. Pointer was binding the victims, the [Petitioner] and Pop started to ask the victims where the money was, with the [Petitioner] stating, "[W]here is the money; ya'll know where the money is." T.B. testified that while the [Petitioner] was demanding the money, Pop "was just standing around just watching everything" and that he appeared to be using a phone or a walkie-talkie to narrate the unfolding events to someone outside of the residence. All of the victims testified that the [Petitioner] was in close proximity to them while they were in the bedroom and that he was holding his gun.

Shortly after duct taping the victims, the men began ransacking the house. T.B. testified that the men were "going through everything, pulling everything out." P.M. testified that the [Petitioner] was "[u]sing a lot of profanity, asking us where the money [was] and mostly he was just tearing up the house." The [Petitioner] found P.M.'s purse, and she saw him empty the contents onto the floor. P.M. testified that $400 and a cell phone were

taken from her. Each of the victims testified the [Petitioner] was primarily responsible for the search of the house.

While the [Petitioner] was scouring the residence, Mr. Pointer took P.M. into J.C.'s bedroom. He removed the tape from her mouth and started to kiss her. He pulled off her pajamas and kissed her breasts. He then took down his pants and demanded that P.M. perform oral sex on him. When she was finished, Mr. Pointer told her that "he was going to do [her] daughter the same way" if P.M. did not tell him where the money was. Mr. Pointer returned P.M. to T.B.'s room and took T.B. to J.C.'s room. When P.M. returned to the room, Pop was the only man in the room.

In J.C.'s bedroom, Mr. Pointer began to sexually assault T.B. During the assault, the [Petitioner] opened the bedroom door, and Mr. Pointer stopped his assault and pretended as though he was simply talking to T.B. The [Petitioner] immediately closed the bedroom door, and Mr. Pointer resumed his sexual assault. The [Petitioner] later opened the bedroom door a second time and caught Mr. Pointer in the midst of his assault. The [Petitioner] entered the bedroom and said to Mr. Pointer, "[W]hat are you doing, come on out of there" and exited the bedroom. Mr. Pointer then returned with T.B. to her bedroom.

Once the three men and the victims were back in T.B.'s room, T.B. heard the men telling a fourth party that they could not find anything and asking if they should leave the residence. J.C. heard the men say "'that the house was clean,'" and he observed them ripping the telephones out of the wall. Pop was speaking with an individual on a walkie-talkie, and this person told the men to exit the residence. J.C. testified that before the men left, they instructed the victims not to leave until the men were gone. The men made off with J.C.'s cell phone and several dollars off of his dresser, P.M.'s cell phone and $400 from her purse, and a cell phone belonging to T.B.

After the men left, the victims began to assist each other in removing the duct tape. T.B., whose hands had been freed when Mr. Pointer took her into J.C.'s bedroom, called the police. Several officers, including Detective Edmond Strickling, arrived at the scene. Detective Strickling testified that in 2009, he was working for the Metro Nashville Police Department in the sex crimes unit. He arrived at B.M.'s residence and interviewed P.M., T.B., and J.C. He interviewed the three separately, and each provided the same general description of the [Petitioner] as a [sic] African-American

male who wore a black "hoodie", had dreadlocks "[p]ossibly down to his shoulders," and a tattoo of the letter "C" on his forearm. After the interview, P.M. and T.B. went to the hospital for a medical examination. Detective Strickling took DNA swabs from P.M. to the Tennessee Bureau of Investigation ("TBI") to put in the CODIS system for testing. However, he was not able to develop any other leads in the case, and the case "kind of went cold."

Nearly a year and a half after the robbery, on February 14, 2011, T.B. saw the [Petitioner] when both were being booked into jail. The [Petitioner] had already been booked, and T.B. was beginning the booking process. When T.B. saw the [Petitioner], she immediately recognized him as one of the men who broke into her house. His tattoos were not visible, but she was able to recognize him based solely upon his facial features. When the [Petitioner] saw her, he "did a double take," and he approached T.B. to speak with her. He asked T.B. to make a phone call for him, and T.B. told him that she could not use the phone. The [Petitioner] continued to try to speak to her, and eventually a guard locked the [Petitioner] in a separate cell.

T.B. estimated that she was with the [Petitioner] for an hour in jail. When she left, the [Petitioner] handed her a slip of paper with "a lot" of names and telephone numbers. He asked her to call the numbers to help him get out of jail "before his probation violation c[a]me up in the system." T.B. told her mother that she saw the [Petitioner] in jail, but she did not contact Detective Strickling because she did not know how to reach him.

In April of 2011, Detective Strickling learned that there had been a CODIS match from the DNA swab of P.M. that identified Mr. Pointer. Detective Strickling subsequently contacted P.M. and T.B. and met with them to show them a photograph lineup that included Mr. Pointer. Each victim viewed the lineup separately. Before showing them the lineup, Detective Strickling explained "that the suspect may or may not be in this form, in these photos, don't assume that the guilty party is in the photos, the photo lineup is used in a way to also free up and prove someone's innocence as long as - as well as guilt." T.B. corroborated these cautionary instructions, testifying that Detective Strickland told her prior to showing her the lineup that "it's a page of people, they may or may not have committed this crime, it may just be that they're eliminating someone off of here." Both T.B. and P.M. identified Mr. Pointer from the lineup.

After viewing the lineup, T.B. informed Detective Strickling that she may have seen the suspect with a "C" tattooed on his arm while she was in jail. T.B. had attempted to locate a "Face It" magazine, which contained the mug shots of people who had been arrested, to find the [Petitioner's] mug shot, but she was unable to do so. She was unable to provide Detective Strickling with the piece of paper containing the names and numbers that the [Petitioner] had given her because she had lost it. However, the [Petitioner] had given T.B. his phone number, and Detective Strickling testified that T.B. was able to provide him with that phone number. Detective Strickling retrieved the records for all of the African-American males arrested on the same day as T.B. By cross-referencing the phone number provided by T.B. with the arrest records of February 14, 2011, Detective Strickling was able to discover that the [Petitioner] gave that phone number when he was booked. Detective Strickling looked through the historical photos of the [Petitioner] and saw that he had a tattoo of the letter "C" on his forearm. He agreed that the photograph of the [Petitioner] matched the description given to him by the victims.

After finding the photograph of the [Petitioner], Detective Strickling interviewed Mr. Pointer about the crime. He showed Mr. Pointer a lineup that contained the [Petitioner's] photograph, and Mr. Pointer picked the [Petitioner's] photograph out of the lineup. Mr. Pointer voluntarily provided information about the [Petitioner], using the [Petitioner's] first name. He described the [Petitioner] as a black male with dreadlocks, and he told Detective Strickling where the [Petitioner] lived and the type of vehicle that he drove.

After speaking with Mr. Pointer, Detective Strickling compiled a photographic lineup that contained the [Petitioner's] picture. He testified that he did not tell the victims that the man T.B. had seen in booking was in the lineup or that any of the persons in the lineup had a tattoo of the letter "C." He stated that he read the victims the "advisory for reviewing a photograph form" and explained to the victims that "the guilty party may or may not be in here, and the purpose of the photo lineup is to free up the innocent as well as [implicate] the guilty." T.B. and J.C. confirmed that Detective Strickling gave them cautionary instructions before showing them the lineup. T.B., J.C., and P.M. each viewed the lineup separately. T.B., J.C., and Detective Strickling all testified that Detective Strickling did not direct their attention to a particular photograph. T.B. picked out the [Petitioner's] photograph almost immediately after seeing the lineup, and she told Detective Strickland that she was "[o]ne hundred percent sure" of

her identification. J.C. also selected the [Petitioner's] photograph, and he believed that he was "75 to 80 percent" confident in his identification.

Kirk Pointer testified that he pled guilty to aggravated rape, aggravated sexual battery, two counts of aggravated robbery, and aggravated burglary stemming from the incident at the victims' home. He stated that he was friends with the [Petitioner] and Pop and had known them for about six months prior to the incident. The men met at Mr. Pointer's aunt's house to discuss the crime. He knew the [Petitioner] as "Rod" and the third man as "Pop." Mr. Pointer recalled that the [Petitioner] had dreadlocks and tattoos on his arms. When asked whose idea it was to commit the robbery, Mr. Pointer testified, "I think it was - I think it was they idea." He believed that the house was selected because it contained drugs. He did not have any knowledge that drugs were in the house, and he received this information from the [Petitioner] and Pop. He agreed that the District Attorney did not threaten him or coerce him into pleading guilty and that he did not receive any promises in exchange for his guilty plea. He agreed that the District Attorney did not ask him to testify at trial in exchange for a plea deal.

On cross-examination, Mr. Pointer testified that he had "a lot" of prior felonies. He agreed that he was facing a potential sentence of life without parole as a result of the "three strikes rule." He agreed that he was initially charged with fourteen crimes and that nine were dismissed after he pled guilty to five. He testified that the [Petitioner] may have had a "C" tattooed on his arm but that he could not recall what was on the [Petitioner's] other arm. He testified that he did not attempt to help detectives find Pop because he did not know where to find him.

Mr. Pointer's attorney testified that he had thorough discussions with the District Attorney about a plea bargain for Mr. Pointer. He agreed that the discussions did not involve the possibility of Mr. Pointer testifying against any of his co-defendants in the case.

Ellard Miller testified that he was the records technician at the Davidson County Sheriff's Office. He authenticated documents that showed that the [Petitioner] and T.B. would have been in the booking area at the same time.

Dr. Jeffrey Neuschatz testified as an expert in the field of eyewitness identification. He testified that a lengthy retention interval between an

event and a later viewing of a lineup could be harmful in making an accurate eyewitness identification and could potentially lead to a mistaken identification. He testified that it was possible that T.B. could have mistakenly incorporated her encounter with the [Petitioner] in jail into her memory of the robbery. He stated that as a result, T.B. could have been mistaken in her later identification of the [Petitioner].

Dr. Neuschatz testified that a high-stress situation decreases a person's ability to make an accurate identification. He discussed "weapon focus," which is a theory that if a weapon is present, a person is more likely to be looking at the weapon instead of focusing on the other aspects of the event. He testified that weapon focus "inhibits people's ability to make accurate identifications."

Dr. Neuschatz explained that confidence in an identification did not always correlate to accuracy in the identification. He testified that confidence was affected by a variety of factors that were unrelated to the accuracy of an identification or the memory of a particular event. He also testified that covering a person's hairline impaired the accuracy of an eyewitness identification. He agreed that if a person's face were covered with a bandana, it could affect another person's ability to accurately remember the event and make an identification. He testified that it was more difficult to identify a person whose face was covered than a person whose face was fully visible.

Dr. Neuschatz testified that several guidelines for conducting an unbiased lineup were followed in this case but that several were not followed, particularly the lack of a "double blind" lineup. He testified that the lineup was not a double blind lineup because Detective Strickling knew the identity of the suspect. He explained that the guidelines for unbiased lineups were promulgated by the Department of Justice, but he agreed that the Department of Justice had not recommended a double blind lineup when the lineup guidelines were published in 1999. He agreed that the combined effect of a high-stress situation, the presence of weapons, and the covering of faces could have led to a mistaken identification in this case.

*Crosby*, 2015 WL 4197613, at *1-5 (footnotes omitted). Based upon this evidence the jury convicted the Petitioner of four counts of aggravated kidnapping, three counts of aggravated robbery, one count of burglary, one count of aggravated assault, and one count of possession of a firearm during the commission of a dangerous felony, and the trial court imposed an effective sentence of thirty-four years.

The Petitioner filed a post-conviction petition alleging, among other things, ineffective assistance of counsel. He contended that his attorney ("Counsel") was ineffective for: (1) failing to communicate adequately with the Petitioner; (2) failing to adequately investigate the case; and (3) failing to withdraw at the Petitioner's request. At the post-conviction hearing, the Petitioner testified that his case, from arraignment to trial, lasted approximately fourteen months. During this time, he said that he met with Counsel two times. The Petitioner stated that he met with Counsel's private investigators "often" but that the investigators were unable to answer the Petitioner's questions.

The Petitioner testified that Counsel provided him with a copy of the discovery in the case but that he did not understand most of what he read. He recalled telling Counsel that he did not understand the discovery documents he was reading, and Counsel responded that the Petitioner matched the suspect's description. The Petitioner said that Counsel did not attempt to explain discovery to him. He reiterated that he mostly met with investigators who were unable to answer his questions. The Petitioner did not articulate what his questions about the discovery were but agreed that his questions were "outside of what it was that [the investigators] were investigating."

The Petitioner testified that Counsel never discussed the possibility of filing pre-trial motions. Further, Counsel never discussed a defense strategy or the strength of the State's case against the Petitioner. The Petitioner stated that Counsel failed to review his statements to police with him before the trial. He agreed that he waived his right to testify at the trial but explained that he chose not to testify because he "didn't know half of what I was even going through."

The Petitioner testified that he provided Counsel with information about potential witnesses and Counsel failed to contact these potential witnesses. The Petitioner said that he tried to give Counsel his mother's phone number but that Counsel did not want to speak with her unless she was "a part of the case." The Petitioner said that he wanted Counsel to speak with his mother because he did not understand what he was being told by the investigators. He confirmed that the only person he wanted Counsel to contact was his mother. The Petitioner said that he did not recall Counsel ever returning one of his phone calls but that Counsel did respond to the Petitioner's letters. He said the responses, however, were unhelpful. The Petitioner confirmed that "most communication" with Counsel occurred at court.

The Petitioner testified that, due to these difficulties, he sent a letter to the Board of Professional Responsibility "explaining that we [are] having a conflict of interest, that I don't know what I'm dealing with." The Petitioner identified a March 10, 2012 response letter from the Board of Professional Responsibility that included Counsel's

response to the complaint. After receiving this letter, the Petitioner did not see Counsel again until trial, seven months later. The Petitioner identified a "motion for dismiss counsel" that the Petitioner filed on September 10, 2012. When asked about the outcome of this motion, the Petitioner said he "never even came in the courtroom for this motion."

The Petitioner testified that he wanted Counsel to access phone records and his co-defendant's cell records. The Petitioner claimed that the numbers Mr. Pointer provided the detectives were not his phone numbers. The Petitioner believed that the phone records would have shown that Mr. Pointer was "trying to use his story to involve [the Petitioner] in the case." The Petitioner said that the phone records might have shown that he was outside the residence when he received a phone call from one of his co-defendants instructing him to enter the residence.

On cross-examination, the Petitioner agreed that he understood the allegations against him and, generally, what the testimony against him would be at trial. The Petitioner confirmed that he was aware before trial that he had been identified as a perpetrator of the crimes. The Petitioner agreed that Counsel visited him in jail in February 2012, approximately seven months before trial. When asked what questions he had that Counsel did not provide answers for, the Petitioner reiterated "I didn't understand fully of what I was reading." When pressed for more specific examples of what questions went unanswered, the Petitioner stated that Counsel was not "trying to get [his] side of the story" and merely urged him to sign a plea agreement with the State.

The Petitioner testified that Counsel conveyed the State's offer of a fifteen-year sentence to plead guilty. He explained that he did not want to enter the plea agreement because he was serving a probation sentence originating in Georgia. He denied that Counsel ever told him that the minimum sentence possible was fifteen years. The Petitioner acknowledged that Counsel filed a motion to suppress the identification in his case and obtained an expert witness, Dr. Neuschatz, to testify at trial. The Petitioner agreed that in August 2012, Counsel met with the Petitioner five times in one week and at multiple other court hearings. He further agreed that Counsel attempted to talk to him about the Petitioner's tattoos and what the State's witness might testify to at trial but that he could not listen because Counsel "argu[ed] and holler[ed] at [him]." The Petitioner agreed that Counsel encouraged him to enter a guilty plea, but he did not because Counsel failed to explain the process. The Petitioner agreed that Counsel's paralegal explained the State's offer to him.

Counsel testified that he was appointed to the Petitioner's case and attended the arraignment on August 10, 2011. Counsel said that he filed for discovery, reviewed it, and then sent a copy to the Petitioner. He said that he discussed the State's evidence with the Petitioner and what the defense would need to negate the proof. Counsel said that, in

his interactions with the Petitioner, he found that when he told the Petitioner what he did not want to hear, the Petitioner would claim they could not communicate. Counsel stated that the defense faced significant challenges because the eyewitnesses identification was based upon some very specific characteristics, such as the tattoo and dreadlocks, and Mr. Pointer intended to testify against the Petitioner.

Counsel testified that the Petitioner did not agree with the State's witnesses and wanted to proceed to trial. He said that the Petitioner would become upset if Counsel did not agree with the Petitioner's version of the events. Counsel stated that he did not believe it was his job to agree with the Petitioner's version of the events but rather to explain the charges, range of punishment, evidence, and possibilities for the defense. In evaluating the relevant factors of this case, Counsel became of the opinion that it would be very difficult to succeed at trial. Counsel discussed the unique circumstances that led to the State making the low offer for a guilty plea in this case. He said that he took the Petitioner's mother to the holding cell so that she could speak with him and possibly explain "things" to the Petitioner. At the end of the discussion, the Petitioner's mother said, "we're gonna leave this in God's hands and you take it to trial."

Counsel testified that he was aware that, at the time of the offense, the Petitioner was serving a probation sentence in Georgia. The State factored the probation sentence into its offer. Counsel stated that the State's offer and the Petitioner's potential sentence if convicted at trial were "repeatedly explained to him." He said that he was "dumbfounded" that the Petitioner now claimed that he did not understand. Counsel recalled that the assistant district attorney assigned to the case reviewed the State's offer with the Petitioner, as did Counsel's paralegal. Counsel said that the Petitioner told him that he did not want to accept the offer because his uncle, who had served time in the Department of Correction, felt "the offer was too much."

Counsel testified that, in an attempt to answer some of the Petitioner's questions, he arranged for the assistant district attorney to meet with he and the Petitioner to discuss who the witnesses would be, why the State was making their offer, and why the Petitioner was charged with those specific offenses. Counsel confirmed that he discussed with the Petitioner pre-trial motions and the State's notice of enhancement. Counsel filed a motion to suppress the photographic lineup, but the trial court denied the motion. As to the Petitioner's complaint that Counsel would not speak with his mother, Counsel stated that he did speak with her; however, he noted that the Petitioner's mother was not a witness to the crimes nor did she have any information about the offenses that would aid the defense.

Counsel testified that he did not recall discussing phone records with the Petitioner but said that he typically would not present evidence that a client had contact with a co-

defendant during an offense. Counsel stated that he was aware of the notice of enhancement and agreed that the prior offenses were for possession of a firearm and a felony drug offense.

On cross-examination, Counsel testified that he filed a motion with the court to get an investigator assigned to the case. Counsel said he did not recall the Petitioner asking about obtaining phone records, but in his experience it was often harmful to present communication with a co-defendant during an offense. Counsel said that he tried to "distance" the Petitioner from the crime. Counsel read a portion of his response to the Board of Professional Responsibility with respect to the Petitioner's complaint, "I have no intentions of withdrawing from representation of [the Petitioner]." Counsel agreed that in the following paragraph, he stated that he would not speak with the Petitioner's mother because he had no obligation under the Rules of Conduct to do so.

After hearing the evidence, the post-conviction court denied relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner maintains his claim that Counsel's representation was ineffective. He contends that Counsel failed to adequately communicate with him, failed to adequately investigate the case, and failed to withdraw at the Petitioner's request. The State responds that the Petitioner has not met his burden of showing that any alleged deficiency led to his conviction. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v.*

*Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Communication

The Petitioner alleges that Counsel failed to keep him informed throughout the case and that, because Counsel failed to effectively communicate with the Petitioner, he was unable to assist in his own defense. The State responds that the Petitioner has failed to establish any deficiency or any resulting prejudice.

As to this issue, the post-conviction court made the following findings:

Trial Counsel met with Petitioner multiple times at set court dates and visited him at the jail on at least six (6) occasions. During these meetings, Trial Counsel provided and reviewed with Petitioner the written discovery, including what the State's witnesses were expected to say at trial, explained to him the charges against him, what the State had to prove, and the range of punishment. And, by his own admission, Petitioner met multiple times with the investigator to discuss the case although the investigator could not answer all of his questions. Although it may be viewed by some as unorthodox, Trial Counsel had Petitioner speak with the District Attorney on two separate occasions for her to also explain to him his criminal exposure, including his exposure to enhanced punishment, and confirm that the co-defendant intended to testify against him. Additionally, Trial Counsel had his paralegal speak with Petitioner concerning his exposure, how jail credits were applied for these types of charges, and other factors bearing on sentencing based on his own experiences from serving time for

aggravated robbery convictions. Trial Counsel also communicated with the plea deal multiple times to Petitioner and advised him to take it.

. . . .

Petitioner has failed to present credible evidence that Trial Counsel failed to meet with him to discuss the merits of the State's case and his exposure if convicted. In fact, the record shows Trial Counsel went to great lengths to insure that Petitioner understood the nature of the charges against him, the possible punishment related to the offenses, the evidence against him as contained in the discovery, which was given to and reviewed with him by Trial Counsel.

The evidence does not preponderate against the post-conviction court's findings. The Petitioner initially claimed he only met with Counsel twice, but during further questioning he acknowledged meeting with Counsel on numerous court dates. The Petitioner agreed that Counsel met with him five times in one week in August 2012 and visited him in jail in February 2012. Further, the Petitioner agreed at the post-conviction hearing that he met with Counsel's investigator multiple times. The Petitioner also agreed that he met with Counsel's paralegal. Counsel testified that, due to the Petitioner's continued questioning about why he was charged with certain offenses and concern about whether his co-defendant would testify, he arranged for the Petitioner to speak directly with the assistant district attorney assigned to the case in hopes of resolving the Petitioner's concerns. Moreover, the Petitioner has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Accordingly, the Petitioner has not shown that he is entitled to relief under the *Strickland* standard. Therefore, the post-conviction court properly denied relief.

### B. Investigation

The Petitioner asserts that Counsel failed to investigate the case. Specifically, he challenges Counsel's failure to subpoena the Petitioner's or his co-defendant's phone records and Counsel's failure to speak with the Petitioner's family about an alibi. The State responds that the Petitioner has not established a deficiency or prejudice from any alleged deficiency.

The post-conviction court made the following findings:

- 15 -

Petitioner complains that Trial Counsel failed to adequately investigate the case or to develop a defense strategy for the trial. In support of his position, Petitioner specifically points to Trial Counsel's failure to interview his mother and sister to develop an alibi and his failure to obtain Petitioner's phone records to establish his non-presence at the victims' apartment, thus corroborating his alibi by his family.

. . .

Trial Counsel admits that he did not investigate either "alibi" situation as possible defenses . . . .

Initially the court notes that Petitioner did not have his mother or sister testify at the post-conviction hearing to-establish that they would have provided an alibi defense. A petitioner who claims ineffective assistance of counsel based on the failure to call witnesses must present those witnesses at the post-conviction hearing, for the court is not in a position to speculate as to what the witness might say or if the witness is credible. *State v. Black*, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990). [ ]

More importantly, Petitioner's own testimony at the post-conviction hearing belies the viability of an alibi defense and corroborates Trial Counsel's opinion that Petitioner's family members were not credible. Although Petitioner complains about the failure to pursue an alibi defense, he admits that he was present and ransacked the house, but denied culpability because he didn't know the reason his co-defendants went there until he was called by Mr. Pointer to come to the apartment. Before then, he claims to have been waiting outside. He further claims that his phone records would have established the fact that he was waiting outside when Mr. Pointer called. Being present at the scene is not an alibi. Instead it is an admission against interest.

An attorney has an affirmative duty to "conduct an appropriate investigation, both factually and legal". *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). If the investigation leads to possible defenses, then trial counsel "must assert them in a proper and timely manner". *Id*. If counsel foregoes any part of the investigation, the decision to do so must be based on sound reasoning. *Strickland v. Washington*, 466 U.S. at 690-91. Although a defendant's statement or confession may not eliminate counsel's duty to investigate, the reasonableness of counsel's action "may be determined or substantially influenced by the defendant's own

- 16 -

statements or actions. The court is perplexed how Petitioner can complain about Trial Counsel not developing an alibi defense when it is clear that to do so would require the use of perjured testimony. Further, it boggles the court's mind why Petitioner would want Trial counsel to get the phone records that would confirm his presence at or near the scene of the crime. The issue is without merit.

The evidence does not preponderate against the post-conviction court's findings. The Petitioner testified that the phone records would show that he was at the crime scene. Counsel testified that he did believe that this evidence would benefit the defense. Further, the Petitioner failed to show how the absence of the phone records prejudiced him. As to Counsel's failure to interview the Petitioner's family, we agree with the post-conviction court that to succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). No such witnesses testified at the post-conviction hearing in this case. Therefore, we conclude that the Petitioner has not shown by clear and convincing evidence that Counsel was deficient in his investigation of witnesses.

Accordingly, we conclude that the post-conviction court did not err when it denied relief as to this issue. The Petitioner failed to show that Counsel's representation was ineffective and that he was prejudiced by Counsel's representation. The Petitioner is not entitled to relief.

### C. Failure to Withdraw

As his last issue, the Petitioner argues that Counsel was ineffective because he failed to withdraw as counsel at the Petitioner's request. The State responds that, because the trial court denied the Petitioner's motion to withdraw, Counsel was required to continue his representation of the Petitioner.

As to this issue, the post-conviction court made the following findings:

Testimony was given that Petitioner filed a motion for Trial Counsel to withdraw. Using its discretion, this court denied the motion and Trial Counsel was not allowed to withdraw. Because Trial Counsel could not withdraw from representation without the consent of this court, Trial Counsel was not ineffective in this regard.

The evidence does not preponderate against the trial court's findings. Counsel was not free to withdraw from representation without the trial court's permission. The

Petitioner filed a motion and had the burden of establishing a ground for the grant of substitute counsel. *State v. Gilmore*, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991). The trial court denied the motion; therefore, Counsel was not at liberty to withdraw.

Accordingly, the trial court did not err when it denied relief on this basis. The Petitioner is not entitled to relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction's court dismissal of the Petitioner's post-conviction petition.

_____
ROBERT W. WEDEMEYER, JUDGE